UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal No. 24-CR-000476 (JMC) |
| | : | |
| JAYVON GATTISON, | : | |
| | : | |
| Defendants. | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

In October 2018, Jayvon Gattison shot and killed man who tried to rob him during a drug transaction. In October 2024, just three months after he was released from incarceration in that case and while he was still on probation, Gattison was arrested in Washington, D.C. with a loaded gun and bag full of marijuana and cocaine. Gattison knows better than most that the combination of guns and drugs can be deadly. Despite his knowledge of the potential consequences, Gattison placed the community in danger by illegally possessing a firearm alongside large quantities of illegal substances. The Court should sentence him to a significant prison term—64 months.

**BACKGROUND**

*The October 9, 2024 Offense*

On October 9, 2024, at approximately 7:00 p.m., members of the Metropolitan Police Department ("MPD") Robbery Suppression Unit ("RSU") were traveling down the 3000 block of Channing Street Northeast in the 5th Police District of Washington, D.C. At the corner of Channing and 30th Streets Northeast, RSU Investigators observed a group of approximately five individuals standing on the sidewalk next to a silver Lexus vehicle smoking.

The Investigators got out of their vehicles and approached the group. As they approached the group, the Investigators recognized the smell of burning marijuana. All the individuals were

detained including an individual, later identified as the defendant, Jayvon Gattison, who had a black Adidas bag slung over his shoulder and was holding a lit marijuana cigarette in his left hand.



*Figure 1 – Investigator Turner's BWC of Gattison holding a lit marijuana cigarette, circled in red*

Investigator Gregory Turner took the marijuana cigarette from Gattison's hand, removed the bag from his shoulder, and placed Gattison under arrest for public consumption of marijuana. The cigarette subsequently field-tested positive for THC.

Investigator Minzak then took the Adidas bag and looked into the open top with a flashlight and saw a large bag of suspected marijuana.



*Figure 2 – Marijuana recovered from inside Gattison's bag*

Investigator Minzak then placed the bag on the hood of the silver Lexus, moved the large bag of marijuana and discovered a firearm. Investigator Minzak then secured the firearm, large bag of marijuana, and other contents of the bag, inside the bag in the trunk of an MPD vehicle. Later, while still on scene, Investigator Minzak returned to the bag and found the defendant's identification inside the bag after the defendant refused to provide any identifying information.

Once at the police station, the firearm was recovered from the bag by MPD Investigator Rony Desir and discovered to be a black Glock 17 9mm with serial number BCPT004. One round of ammunition was in the chamber and 14 additional rounds were in a 17 round capacity magazine.



*Figure 3 – Glock 17 9mm handgun with one round in the chamber and 14 additional rounds in a 17-round capacity magazine recovered from inside Gattison's bag*

Also, inside the bag were (3) clear plastic bags containing 240 grams of green weed substance, a portion of which field tested positive for THC, a clear plastic bag containing 12 grams of a white rock substance a portion of which field tested positive for cocaine base, a black digital scale, and $320.80 in cash.

Gattison has a prior criminal felony conviction punishable by a term of incarceration greater than one year. On December 5, 2019, Gattison was sentenced to 10 years confinement, 4 years suspended, followed by 3 years of probation for a conviction to Voluntary Manslaughter in Prince Georges County, Maryland.

## Legal Authority and Argument

### *Procedural History*

On October 10, 2024, Gattison was charged by complaint with one count of Unlawful Possession of Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 USC § 922(g)(1). He was indicted on the same charge on October 23, 2024. On January 8, 2025, Gattison pled guilty to the single-count indictment.

### *The Pre-Sentence Investigation Report*

The Pre-Sentence Investigation Report ("PSIR") in this matter summarizes Gattison's personal and criminal history. ECF No. 19. Gattison is 24 years old and was born and raised in the Maryland suburbs on Washington, D.C. PSIR at 12. He reports being raised by two involved parents; he lived with his mother as a child and with his father as a teenager, after he started getting in trouble in school. *Id*.

Gattison's mother referred to him as "smart" and "laid back," and reported that he attended Talented and Gifted (TAG) programing as a child. PSIR at 13. Gattison did not report any mental health issues or past treatment. PSIR at 14.

Gattison admitted to smoking marijuana nearly daily since he was 13 and that he had experimented with other drugs at various times. PSIR at 15. As a teenager, he attended a drug treatment program for his marijuana use but reported that he did not find treatment helpful. *Id.*

Gattison has two prior convictions and multiple additional arrests. PSIR at 8-12. In October 2019, Gattison pled guilty to Voluntary Manslaughter in Prince George's County, Maryland. According to the PSIR, the decedent and a group of others arranged to purchase marijuana from Gattison. The decedent and his group then attempted to rob Gattison at gunpoint. During the

attempted robbery, Gattison pulled out a gun and shot the decedent once, killing him. PSIR at 8.

In November 2019, after he pled guilty to the Maryland manslaughter but before he was sentenced, Gattison was arrested with a gun in his pocket. PSIR at 11. This case was placed on the stet docket. *Id.*

Gattison was sentenced on the Maryland manslaughter in December 2019 to 10 years' incarceration, 4 years suspended, and 3 years of supervised probation. PSIR at 8. While serving this sentence, Gattison was found in possession of a prohibited homemade weapon in the jail. PSIR at 9. He pled guilty to weapons charges in 2021 and was sentenced to 6 months' incarceration. *Id.*

Gattison was released from incarceration in Maryland in July 2024. PSIR at 8. Just three months later and while he was still on probation for the Maryland manslaughter, Gattison was arrested on the instant case.

Gattison has been detained in this case since his arrest in October 2024.

## ARGUMENT

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for –
    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
        (i) issued by the Sentencing Commission . . .; and
        (ii) that, . . . are in effect on the date the defendant is sentenced; . . .

(5) any pertinent policy statement –
    (A) issued by the Sentencing Commission . . . and
    (B) that, . . . is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

But the Sentencing Guidelines are only "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). They "are not the only consideration." *Id.* A sentencing judge "should . . . consider all of the § 3553(a) factors," and "[i]n so doing, . . . may not presume that the Guidelines range is reasonable." *Id.* at 50. "[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines, in cases in which the Guidelines do not fully account for those factors, or when a district court applies

broader § 3553(a) considerations in granting the variance." *United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) (citation and internal quotation marks omitted). In doing so, "the district court can rely on hearsay as evidence for its findings." *United States v. Miller*, 35 F.4th 807, 818 (D.C. Cir. 2022). *See also United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014) ("Clear precedent permits hearsay to be used in sentencing decisions."). And the sentencing court can consider conduct by a defendant that was not charged or even for which a defendant was acquitted. *See United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[L]ong-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proven by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction.").

## THE APPLICABLE SENTENCING GUIDELINES

The PSIR estimates Gattison to be in Criminal History Category III based on two prior convictions—the first for Voluntary Manslaughter and the second for Concealing a Dangerous Weapon. PSIR at 8-9. The government agrees with this calculation.

The government also agrees with the United States Probation Office that the appropriate total offense level is 23. PSIR at 7. Although Gattison has not formally objected to the PSIR, he has previously indicated that he believes the appropriate total offense level is 18. PSIR at 3. But this calculation is based on an incorrect application of the United States Sentencing Guidelines ("USSG"), one that disregards facts acknowledged by Gattison in the Statement of Offense and ignores Gattison's criminal history. Because this case involved a large capacity magazine and, at the time of his arrest, Gattison had previously been convicted of a crime of violence, the

appropriate base offense level is 22. *See* PSIR at 7; USSG § 2K2.1(a)(3).

The instant offense involves a gun loaded with a 17-round large capacity magazine. *See* Statement of Offense, ECF 15; *see also* USSG § 2K2.1(a)(3) n. 2 (defining a large capacity magazine as one "that could accept more than 15 rounds of ammunition"). By accepting the factual proffer and pleading guilty in this case, Gattison acknowledged possession of a large capacity magazine. *See* Statement of Offense, ECF 15. Thus his suggestion that the Court adopt a base offense level of 14—which would not account for the large capacity magazine—is inappropriate. *See* USSG § 2K2.1(a)(6).

Additionally, at the time he committed the instant offense, Gattison had a prior conviction for a crime of violence: Voluntary Manslaughter, in Prince George's County, Maryland. PSIR at 8. To decide whether a defendant has a prior "crime of violence" under § 2K1.2(a)(4), we look to the definition of that term in U.S.S.G. § 4B1.2. Section 4B1.2 provides two independent avenues by which a prior conviction can be classified as a crime of violence: a "force" or "elements" clause (like the one found in 18 U.S.C. § 924(c)) and an "enumerated-offense" clause (which § 924(c) lacks). A given offense need only satisfy one of the two clauses to be classified a crime of violence. Maryland Voluntary Manslaughter satisfies both prongs. *See* Ex. 1 (Sentencing Transcript from *U.S. v. Robert Theodore Smith*, 1:24-cr-00168, in which Judge Bates found that similar offense of D.C. voluntary manslaughter was a "crime of violence" under both prongs of § 4B1.2).

First, voluntary manslaughter is specifically enumerated as a "crime of violence" in the Guidelines. *See* U.S.S.G. § 4B1.2(a)(2) (defining a "crime of violence" as "any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that . . . is . . . voluntary manslaughter."). "To determine whether a past conviction is for one of those [enumerated] crimes, courts use what has become known as the 'categorical approach': They

9

compare the elements of the statute forming the basis of the defendant's conviction with the elements of the 'generic' crime—i.e., the offense as commonly understood. The prior conviction qualifies as a [crime of violence] only if the statute's elements are the same as, or narrower than, those of the generic offense." *Descamps v. United States*, 570 U.S. 254, 257 (2013); *see also Quarles v. United States*, 139 S. Ct. 1872, 1880 (2019) (applying categorical approach to enumerated offenses). Maryland takes a common law approach to Voluntary Manslaughter, defining it as "*intentional* homicide, done in a sudden heat of passion, caused by adequate provocation, before there has been a reasonable opportunity for the passion to cool." *Cox v. State*, 534 A.2d 1333, 1335 (1988). Notably, Maryland Voluntary Manslaughter is a separate crime from Maryland Involuntary Manslaughter. *See id.* (rejecting defendant's argument "that voluntary and involuntary manslaughter are the same crime," and explaining that "[t]he distinction can best be shown by examining the elements of voluntary manslaughter not present in involuntary manslaughter"). Maryland Voluntary and Involuntary Manslaughter are thus "divisible," and the categorical approach focuses only on the elements of Maryland Voluntary Manslaughter. *See Mathis v. United States*, 579 U.S. 500, 505 (2016) (a "divisible" statute "list[s] elements in the alternative, and thereby define[s] multiple crimes").

*Cox*'s holding that Maryland Voluntary Manslaughter reflects the common-law definition of the offense, *see* 534 A.2d at 1335, 1337, suffices to make the offense a categorical match to § 4B1.2 enumerated offense of "voluntary manslaughter." *See Quarles*, 139 S. Ct. at 1877. The caselaw discussing generic voluntary manslaughter also strongly supports this conclusion. *See United States v. Teague*, 884 F.3d 726, 728–730 (7th Cir. 2018) (holding Illinois second-degree murder statute qualifies under the elements clause of § 4B1.2, and also qualifies as "voluntary manslaughter" under the enumerated clause); *United States v. Gomez-Leon*, 545 F.3d 777, 791

(9th Cir. 2008) (noting that "[m]anslaughter itself was subdivided into two branches—voluntary manslaughter (intended homicide in a heat of passion upon adequate provocation) and involuntary manslaughter (unintended homicide under certain circumstance)") (quoting 2 Wayne R. LaFave, *Substantive Criminal Law* § 15.4 (2d ed. 2007)); *United States v. Leaverton*, 895 F.3d 1251, 1257 (10th Cir. 2018) (noting that "[m]ost jurisdictions hold that first degree or voluntary manslaughter involves an intent to kill accompanied by the 'extenuating circumstance,'" and finding Oklahoma's "minority view" approach to not be a categorical match) (citations omitted).

      Second, the Guidelines also classify prior convictions as crimes of violence if they have "as an element the use, attempted use, or threatened use of physical force against the person of another." U.S.S.G. § 4B1.2(a)(1). Courts also employ the categorical approach to make this determination, "which means that we view the crime 'in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion.'" *United States v. Carr*, 946 F.3d 598, 601 (D.C. Cir. 2020). Again, Maryland defines Voluntary Manslaughter as "*intentional* homicide, done in a sudden heat of passion, caused by adequate provocation, before there has been a reasonable opportunity for the passion to cool." *Cox*, 534 A.2d at 1335. As the Supreme Court has recently explained, "[t]he knowing or intentional causation of injury or death, whether by act or omission, necessarily involves the use of physical force against another person," satisfying the elements clause. *Delligatti v. United States*, 145 S. Ct. 797, 810 (2025). Maryland Voluntary Manslaughter, which requires the intentional causation of death, is thus necessarily a "crime of violence" under the elements clause as well. *See also United States v. Smith*, 882 F.3d 460, 464 (4th Cir. 2018) (finding that similar offenses of North Carolina voluntary manslaughter qualifies as a "crime of violence" under the elements clause of the Armed Career Criminal Act, and citing similar rulings with respect to Georgia and Missouri

11

voluntary manslaughter).

The total offense level here is thus appropriately calculated as 23, and Gattison's guidelines range is 57-71 months incarceration.

## THE GOVERNMENT'S SENTENCING RECOMMENDATION

The Government recommends that the Court sentence Gattison to 64 months of incarceration followed by three years of supervised release. This sentence reflects the serious nature of this offense, the repetitive and dangerous history of Gattison's possession and use of firearms and provides adequate deterrence to others in the community given the proliferation of firearms in our community.

**A. Nature and Circumstances of the Offense.**

Gattison, while on probation for killing a man with a gun during a drug-related robbery, was arrested with a loaded gun and drugs. This was his second arrest for firearms possession after his conviction for manslaughter. Despite knowing first-hand the damage firearms can inflict, Gattison has continued to carry firearms.

While these offenses are possessory in nature, our courts have warned against discounting the inherent danger associated with loaded firearms. See *United States v. Blackson*, No. 23-CR-25 (BAH), 2023 WL 1778194, at *7-8 (D.D.C. Feb. 6, 2023), *aff'd*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023) (the absence of evidence of "use" "does little to detract from" the danger posed by a firearm "loaded with 19 rounds of ammunition in an extended magazine, . . . more ammunition than the gun was originally manufactured to carry, thereby increasing its potential to do greater harm" and placement "at the ready, on his person, and easily within reach"). Not only was the firearm loaded, *see United States v. Kent*, 496 F. Supp. 3d 500, 502 (D.D.C. 2020), *aff'd* (Nov. 5, 2020) (noting that "the firearm recovered from the Defendant's person had a round

already chambered, making the circumstances even more troubling,"), but it was equipped with a large capacity magazine, increasing its deadly potential.

Further, arguments concerning "mere possession" ignore the current epidemic of gun violence in our community.[1] A loaded firearm is a deadly weapon. It has the ability with a single pull—as Gattison knows well—to end a life. A firearm can escalate a mundane disagreement or a petty offense into a deadly encounter. And the reason law enforcement targets the possession of firearms prior to the commission of a crime is because once an individual makes the decision to produce a firearm and pull the trigger, law enforcement is powerless to intervene. Gattison knows this better than most. Despite that, he continued to seek out and possess firearms while on probation.

This was a dangerous offense, justifying a significant term of incarceration.

**B. The History and Characteristics of the Defendant.**

Just three months after his release from serving a significant prison term for manslaughter and while he was under active supervision for that offense, Gattison returned to the same behaviors that sent him to jail in the first place: possessing guns and drugs. Gattison incurred his other adult conviction for possessing a homemade weapon while actively incarcerated. Neither supervision nor incarceration seem to have deterred Gattison from continued criminal behavior.

---

[1] *See, e.g.*, Peter Hermann, *Homicides are falling in many big cities. In D.C., they're rising.*, Wash. Post (August 19, 2023, 9:00 a.m.), https://www.washingtonpost.com/dc-md-va/2023/08/19/dc-homicides-rising-major-cities/ ("But more than halfway through this year, killings in the District are surging toward numbers not seen in two decades . . . ."); Matt Gregory, *Tale of two cities: Homicides down in Baltimore, up in DC*, WUSA9 (December 28, 2023), https://www.wusa9.com/article/news/local/homicides-go-down-in-baltimore-less-than-300-dc-homicides-hit-20-year-high/65-14e1f98e-d82c-4878-a5c0-9ac461c47899 ("At the time this article was written DC Police had investigated 271 homicides so far this year, according to the Metropolitan Police Department (MPD.) This time last year the city was at 199.")

Notably absent from Gattison's background are apparent circumstances driving him toward crime. He does not appear to have drug problem or a history of mental illness. He grew up with loving and supportive parents. He attended gifted classes as a kid. He's a smart young man, but he is still making decisions with deadly consequences.

Gattison's history and characteristics merit a significant term of imprisonment.

### C. The Need for the Sentence Imposed.

The requested sentence is sufficient but no greater than necessary to meet the goals of sentencing. The sentence provides specific deterrence: it will keep our community safe from Mr. Gattison for a significant period of time. It provides general deterrence: it will signal to the community that the possession of illegal firearms is a deadly serious matter and hopefully deter others from doing so. And it provides an opportunity for Mr. Gattison to reflect on the serious and repetitive nature of his crimes.

Mr. Gattison knows better than anyone that a gun can irrevocably destroy lives: the lives of those who are harmed by them, the lives of those who wield them, and the families and friends of both. This did not deter him from possessing a firearm with a large capacity magazine. He served six years in jail for using a firearm and was undoubtedly aware that any future possession of firearms could send him back to jail. This did not deter him. Mr. Gattison was on active supervision at the time of the offense. This did not deter him. The requested sentence of 64 months' incarceration is a justified and reasonable one.

## CONCLUSION

For all of the foregoing reasons, the Government respectfully requests that this Court sentence Mr. Gattison to a term of imprisonment of 64 months of incarceration.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY


By: /s/ Megan E. McFadden
MEGAN E. MCFADDEN
Assistant United States Attorney
M.A. Bar Number 687959
United States Attorney's Office
601 D Street NW
Washington, D.C. 20530
Telephone: 202-252-7052
Email: megan.mcfadden@usdoj.gov